1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   THOMAS ANTONIO PRECIADO,

11              Petitioner,              No. CIV S-04-1021 WBS GGH P

12        vs.

13   DAVID RUNNELS, Warden, et al.,

14              Respondents.            <u>ORDER and FINDINGS AND</u>

15   _____/    <u>RECOMMENDATIONS</u>

16   *Introduction and Summary*

17              When will the treatment performed  by medical personnel act as a superseding

18   cause so as to cut off criminal liability against a defendant for the death of the person acted

19   upon?  This sometimes difficult-to-apply legal defense is at issue here.  While petitioner's

20   counsel has accurately set forth the law, he cannot stretch the facts here to warrant application of

21   the defense which was denied to him at trial.  In other words, one cannot be denied a particular

22   defense in a criminal trial, unless the facts could reasonably be seen as giving rise to the defense.

23   Moreover, the facts of this case do not warrant discovery or an evidentiary hearing.  The

24   remaining issues in this case should be denied as well.

25   \\\\\

26   \\\\\

1

*Facts*

The facts set out by the Court of Appeal serve as an accurate backdrop to the issues in this case. Where necessary, the facts will be supplemented in each specific section below as those facts appear in the record.

In the summer of 1999, Yuba City Police Officer Terence Kennedy responded to a burglar alarm at a convenience store. As Kennedy pulled into the parking lot, he saw two people inside the store struggling behind the cash register. An older East Indian woman waved her arms as a young Hispanic man moved his arms up and down. The young man struck the woman, and she struck back. The woman fell to the ground.

The young man fled out the door as Kennedy's vehicle approached the store. The man, whom Kennedy later identified as defendant, wore a dark cap, orange shorts, and a blood soaked white T-shirt. Kennedy chased defendant, knocking him down with the patrol car. Defendant got up and continued to flee; the officer apprehended him on foot.

As Kennedy held him, defendant blurted out, "That bitch, she stabbed me." Kennedy asked defendant where he had been stabbed, and defendant indicated his upper torso. Kennedy checked but found no wounds on defendant's upper body.

Officer Darin Defreece also responded to the alarm and found Kennedy in the parking lot of the store "on top of" defendant. Kennedy asked Defreece to check on the woman in the store. Defreece found the victim standing behind the front counter. The victim, her clothing saturated in blood, was frantic. She tried to use the telephone, which was also covered in blood. Nearby, Defreece found a knife with a four-inch blade on the bloodstained floor. The cash register was knocked to one side and covered in blood.

Defreece examined the victim and found a cut on her neck that did not appear to be bleeding heavily. He asked her to lie down and found a cut on her abdomen that was bleeding fairly heavily and a severe cut on her right hand. Defreece and another officer rendered first aid, applying pressure to the abdominal wound in an attempt to stop the flow of blood. The victim asked for water, and Defreece asked her if "there was only one person" and she replied "yes, only one person." She appeared to be "suffering greatly." An ambulance arrived approximately five minutes later.

Officer Scotty Ramos also arrived on the scene. He found Kennedy standing by his patrol car with defendant in the back seat. Kennedy asked Ramos to watch defendant while he went into the store. Defendant motioned Ramos to come over and speak with him. Ramos opened the back door and defendant stated, without any prompting, "the lady inside the store was crazy." Defendant also said he thought he "might have stabbed her" and "she might have stabbed him." Defendant asked Ramos to check him for stab wounds. Ramos took defendant out of the patrol car and searched for wounds, finding none. He put defendant back into the car.

At the request of Detective Robert Landon, Ramos took defendant out of the car to allow the victim to look at him as she moved from the store to the ambulance. From a distance of five to eight feet, the victim looked directly at defendant, her eyes opened wide, and she moved her head to keep defendant in

view.  Defendant was handcuffed, but his hands were behind him and not visible.  Ramos pat-searched defendant, finding a nylon stocking with two holes cut in it sticking out of defendant's pocket.  Ramos found a bloodstained $50 bill in defendant's other pocket.

When Landon arrived on the scene, he found Defreece kneeling beside the victim trying to render first aid.  Landon saw a kitchen knife with a bent blade lying on the floor near the victim.  As the victim was transported to the ambulance, Landon saw the victim's eyes fix on defendant.  As she was being placed in the ambulance, Landon asked her if she recognized her assailant.  The victim appeared to understand and said, "In the white."  Defendant was clad in a bloody white T-shirt.  No one else in the vicinity wore white.

Landon read defendant his *Miranda* rights, and defendant said he understood them.  Later, at the police station, Landon again read defendant his rights, received a waiver of those rights, and conducted a videotaped interview.

An information charged defendant with murder, second degree robbery, and second degree burglary.  The information alleged murder with special circumstances: murder in the commission of robbery and burglary. (§ 190.2, subd. (a)(17)(A), (G).)  As to the robbery and burglary counts, the information alleged defendant inflicted great bodily injury. (§ 12022.7, subd. (a).) As to the burglary count, the information also alleged defendant personally used a deadly or dangerous weapon. (§ 12022, subd. (b)(1).) FN3

FN3. The court later granted defendant's motion to strike the special circumstances allegations on the ground defendant was a minor at the time of the charged murder.

Defendant moved to suppress his statements to officers, arguing they were involuntary.  The court granted the motion in part and denied the motion in part.  Defendant filed a motion to compel the production of documents from the hospital that treated the victim.  The hospital opposed the motion.  The trial court denied the motion.  The People filed a motion to exclude evidence of alleged malpractice by a doctor who treated the victim in the emergency room.  The court granted the motion without prejudice.

The People filed an information amending the murder charge to first degree murder based upon premeditation or a killing during the perpetration of robbery or burglary.  A jury trial followed.

The officers involved all testified as to their recollections of the day of the murder.  A criminalist testified the $50 bill found in defendant's pocket and the kitchen knife found on the floor had human blood on them.

Dr. Ashraf Ekdawy, the surgeon who treated the victim, examined her in the emergency room.  Ekdawy found stab wounds and lacerations on her neck, collarbone, abdomen, and both hands.  The wound to the abdomen was "penetrating," and the cuts on the right hand had almost completely severed three fingers.  The physician considered the neck wound the most serious because it was "bleed[ing] profusely" and was close to vital structures.  He also considered the abdominal wound serious because of the danger of internal bleeding and the wound's proximity to vital organs.  The victim had "significant" low blood pressure.

Ekdawy had the victim resuscitated and determined the jugular vein in the neck had been 75 percent severed.  Given the angle of the wound to the jugular vein, it was very unlikely it had been caused by the victim's falling on the knife.

According to the physician, "the patient would have to jump and then go down head first, and with an angle, to make that happen."

Ekdawy attempted to control the bleeding prior to repairing the damage. After approximately 15 minutes, he controlled the bleeding in the neck. He probed the abdominal injury and determined a lobe of the liver had been completely penetrated, injuring three major vascular structures. The victim died as Ekdawy worked on the abdominal injury. According to the physician, the victim's neck wound, if left untreated, was life threatening, and her abdominal injuries were probably fatal without prompt treatment.

Sukhdev Dhillon, the victim's husband and owner of the store, also testified. He and his wife, Rupinder, had been running the store for a year and a half. The store had no video camera, and the knife found on the site did not belong to the couple.

A forensic pathologist performed an autopsy on Rupinder Dhillon. He found she had been stabbed in the abdomen by a single-blade knife that passed through the liver and struck blood vessels near the spinal column. The knife penetrated four to five inches. A stab wound also penetrated two inches into the neck, injuring the jugular vein. The pathologist also found several shallow stab wounds to the chest. There were knife cuts on her chin and a shallow stab wound on her face. Both of Rupinder's hands were cut, with severe cuts on the right hand. The pathologist stated these wounds were consistent with defensive wounds, an attempt by the victim to grab the knife from her assailant. Altogether, the pathologist found 20 separate knife wounds. Both the neck and the abdominal stab wounds were fatal, and either could have caused Rupinder's death. According to the pathologist, neither of the fatal wounds was likely to have been caused by the victim's falling on the knife; the abdominal wound was too deep.

Defendant did not testify. The defense presented testimony from defendant's uncle, who saw him at juvenile hall following his arrest. The uncle found defendant incoherent. Defendant's eyes were "rolled back in his head," his mouth was dry, his speech was slurred, and he had trouble maintaining his balance. Defendant appeared to be intoxicated. The uncle testified that defendant's probation officer, who was also present, stated defendant appeared to be drunk. The uncle did not smell alcohol on defendant but stated he was not close enough to have smelled it.

In rebuttal, the People presented testimony by Ramos and Landon regarding defendant's possible intoxication. Both officers were in close proximity to defendant at the scene of the murder and in the interview room at the police station. Neither smelled alcohol on defendant. Landon testified that defendant did not appear intoxicated, but defendant was incoherent and slurred his words at times. Defendant dropped a cup of water, had trouble walking, and complained of numb limbs. Ramos testified that defendant bent over a trash can and appeared to vomit at the hospital the day of the crime. Defendant's blood alcohol level approximately two hours after the murder was zero.

The jury found defendant guilty of all charges and found all the allegations of the information to be true. Defendant filed a new trial motion, which the court denied.

The court sentenced defendant to 25 years to life, with initial housing at the California Youth Authority, on the murder count. The court imposed but stayed punishment on the remaining counts and enhancements. Defendant filed a timely notice of appeal.

People v. Preciado, 2003 WL 121075 (Cal. App. 2003).

Issues

   The issues in this case, somewhat broken out from the way presented by petitioner's counsel, are as follows:

A. The Medical Issues

  1.  Whether petitioner was deprived of his Constitutional right to present a defense by the trial court's refusal to allow discovery on the defense;

  2.  Whether the petitioner was deprived of his Constitutional right to present a defense by the trial court's refusal to accept evidence on the defense;

  3.  Whether petitioner was deprived of his Constitutional right to cross-examine a medical doctor to show bias.

B. The Confession Issues

  1.  Whether petitioner's confession was involuntary;

  2.  Whether Miranda violations made the evidence received inadmissible, i.e., whether petitioner's waiver of such rights was voluntary;

C. The Instruction Issues

  1.  Whether the trial court erred in refusing to instruct on the lesser included offense of manslaughter;

  2.   Whether the trial court erred in refusing to instruct on the lesser included offense of grand theft.

*Legal Standards*

   The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

   In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

1   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

2   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

3   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

4   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

5   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

6   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

7               "Unreasonable application" of established law, on the other hand, applies to

8   mixed questions of law and fact, that is, the application of law to fact where there are no factually

9   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

10   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

11   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

12   deference is not blindly automatic, "the most important point is that an *unreasonable* application

13   of federal law is different from an incorrect application of law....[A] federal habeas court may not

14   issue the writ simply because that court concludes in its independent judgment that the relevant

15   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

16   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

17   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

18   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

19   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

20               The state courts need not have cited to federal authority, or even have indicated

21   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

22   Ct. 362  (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

23   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

24   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

25   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76 , 123 S. Ct. 1166, 1175 (2003).  Moreover,

26   the established Supreme Court authority reviewed must be a pronouncement on constitutional

1  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

2  binding only on federal courts.  Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

3          However, where the state courts have not addressed the constitutional issue in

4  dispute in any reasoned opinion, the federal court will independently review the record in

5  adjudication of that issue.  "Independent review of the record is not de novo review of the

6  constitutional issue, but rather, the only method by which we can determine whether a silent state

7  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

8  2003).

9  *Discussion*

10         The primary issue here is petitioner's assertion that he was denied an opportunity

11  to prove the victim's death was caused by hospital/doctor malpractice, and not from the wounds

12  inflicted by petitioner which occasioned the hospital treatment.  The cross-examination issues,

13  i.e., the court's unwillingness to allow cross-examination of the treating physician into the

14  propriety of the victim's medical treatment, rise or fall with the primary issue.  If the trial court

15  was correct in its preclusion rulings concerning the substance of the medical treatment, the

16  inability to cross-examine on the issue of physician bias was inconsequential.

17  A.  The Medical Issues

18         Petitioner's primary claim revolves about his assertion that he was not permitted

19  to put on a defense of gross medical incompetence as being a cause of the victim's death.  No

20  one doubts that a federal constitutional issue is involved in the abstract for such an assertion.

21  Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038 (1973).  However, as discussed

22  below, the fatal flaw is that the "defense" or "defense theory" must have a basis in state law.

23  Petitioner, in essence, asks this court  to change the state law  to legitimize facts which do not fit

24  into any established, viable theory countenanced by state law.

25  \\\\\

26  \\\\\

7

1. Failure to Allow Discovery or Presentation of Malpractice Evidence

The discussion commences with a short exposition of California law on the ability of a criminal defendant to evade murder responsibility for injuries occasioned by that defendant because of a medical provider's superseding treatment of the victim.

> We have said that 'If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death. [Citations, including People v. McGee (1947) 31 Cal.2d 229, 243, 187 P.2d 706.] To be sure, when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the *sole cause of death* and hence an unforeseeable intervening cause. [Citations, including People v. McGee, supra, 31 Cal.2d at p. 240, 187 P.2d 706.]' ( People v. Roberts (1992) 2 Cal.4th 271, 312, 6 Cal.Rptr.2d 276, 826 P.2d 274.)

People v. Scott, 15 Cal. 4th 1188, 1215, 65 Cal. Rptr. 2d 240, 257 (1997) (emphasis added). Improper medical treatment constitutes 'gross negligence' when the treatment demonstrates " 'an extreme departure from the ordinary standard of conduct.'" Gore v. Board of Medical Quality Assurance , 110 Cal.App.3d 184, 196, 167 Cal. Rptr. 881 (1980). However, causation is a metaphysical concept. "All antecedents which contribute to a given result are, as a matter of fact, the causes of that result." (Perkins & Boyce, Criminal Law (3d ed. 1982) Imputability, § 9, p. 771, fn. omitted (hereafter Perkins).) Thus, conceivably, even an inflicted scratch, given the presence of the right super-bacteria and bad medical treatment can eventually lead to death. No person would, nevertheless, be liable for murder for the mere, offensive infliction of the scratch followed by grossly unforseen circumstances which follow the scratch. The rule is different, however, when life threatening wounds are inflicted.

> " 'When a person inflicts a wound on another which is dangerous, or calculated to destroy life, the fact that the negligence, mistake, or lack of skill of an attending physician or surgeon contributes to the death affords no defense to a charge of homicide.' Following this general rule, it has been held that where the wound inflicted by the accused operates as a cause of death, the fact that the malpractice of attending surgeons may have had some causative influence will not relieve the accused from full responsibility for the ultimate result of his act. [Citation.] On the other hand, in qualification of the rule, it is said that [citation], 'Where a person inflicts on another a wound not in itself calculated to produce death, and the injured person dies solely as a result of the improper treatment of the wound by an attending physician or surgeon, the fact that the death was caused by

8

> medical mistreatment is a good defense to a charge of homicide,' [citations]. On this subject it has been said to be 'the proper, and probably generally accepted view ... that mere negligence [in the treating of a wound] is no defense even though it is the sole cause of death because it is a foreseeable intervening cause. But death caused by grossly improper treatment is not the proximate consequence of the defendant's injury unless the injury is an actual contributing factor at the time of death, because such treatment is an unforeseeable intervening cause.'"

People v. McGee , 31 Cal.2d 229, 240 (1947).

No one would seriously contest herein that the wounds inflicted by petitioner on the victim, including a tearing of the jugular vein such that it was 75 % torn away, and puncture of the liver along with blood vessels proximate to the liver and spine, were anything but life threatening.  Petitioner herein must show that the treatment of Dr. Edkawy was the sole causation of the victim death's herein, and that every other cause in the chain of events was rendered inconsequential by that treatment.

Assuming for the moment that Dr. Edkawy's medical treatment would be considered "grossly incompetent," there is no realistic way for petitioner to prove that the treatment was the sole cause of the victim's death.  No stretch of the facts could conceivably render petitioner's multiple stabbing of the victim inconsequential.  Under any description herein, the victim was not on the road to a clearly expected recovery when Dr. Edkawy commenced his treatment.  Rather, it is clear from the record testimony that the victim would have died in the absence of treatment.  At all times, the seriousness of the inflicted injuries was existing alongside the treatment, incompetent or not, in the efforts to stave off the impending death.  All that petitioner's retained expert could say based on the substantial amount of medical evidence available was that "'the probable cause of death' was due to the wounds suffered by the victim to her throat,'" but adds "that to be certain, he would like to review whatever additional records the hospital might have..."  Petition at 51-52.

Despite the expert's finding that the probable cause of death were the wounds themselves, petitioner then seeks an evidentiary hearing herein positing a curious burden of proof in this habeas action: "one cannot be certain that Dr. Ekdawy's maltreatment was the sole cause

of death."  Id.  Of course, petitioner must show: that the alleged maltreatment *was* the sole cause

of death.  A mere possibility that it was the sole cause, or that we "cannot be certain" about the

effect of Dr. Ekdawy's treatment, or that a confluence of causes existed is insufficient.[1]

The issue then becomes whether petitioner is entitled to an evidentiary hearing

and discovery in federal court to attempt to prove the impossible.  Based on the hurdles within

the substantive law, petitioner was given neither discovery by the state courts, nor was he

permitted to introduce evidence on the possibility, however remote, that Dr. Ekdawy's treatment

snatched death from the near certain jaws of life.

Once it is understood, as is clearly the case here, that petitioner did not delay his

request for an evidentiary hearing in state court,[2] the standards under federal law for an

evidentiary hearing, which are well known and well established in the Ninth Circuit, are as

follows.   "To obtain an evidentiary hearing on an ineffective assistance of counsel claim, a

habeas petitioner must establish that (1) his allegations, if proven, would constitute a colorable

claim, thereby entitling him to relief and (2) the state court trier of fact has not, after a full and

fair hearing, reliably found the relevant facts."  Correll v Stewart, 137 F.3d 1404, 1413 (9th Cir.

1998).  Nevertheless, the court does not have to hold an evidentiary hearing when the record

clearly refutes the collateral factual allegations raised by petitioner.  Schiro v. Landrigan,

__U.S.__, 127 S. Ct. 1933, 1940 (2007); similarly, palpably incredible or patently frivolous

claims need not garner an evidentiary hearing just because the petition "says so."  United States

v. Leonti, 326 F.3d 1111, 1116 (9th Cir. 2003).

The problem with the petition in this case, as supplemented by petitioner's offer

of proof as to what his expert would say, is that the allegations do not, and cannot, state a

---

[1] There is no medical support given whatsoever which would demonstrate here that malpractice could be considered the sole cause of death.

[2] Indeed, petitioner asked for such a hearing, along with discovery, at the earliest possible opportunity, i.e., during his trial proceedings.

*colorable* claim.  The petition is bare bones, and for the most part, simply gives a procedural

chronology.  There is one substantive allegation: "Kelly [nurse in the emergency room]

established grounds supporting that Dhillon died due to medical malpractice of the treating

surgeon."  Assuming for the moment that the nurse was competent to render an opinion of the

standard of care for emergency room physicians in the emergency room and causation, the factual

allegation does no more than establish medical malpractice as a potential cause of the death.  It

comes nowhere near establishing, if accepted, that the malpractice was the "sole cause" of the

death as is required by California substantive law.   It may well be true that poor treatment

precluded the possibility of the victim's recovery from life threatening wounds, but California

law requires much more.  It requires facts demonstrating that the malpractice was so grossly

incompetent that petitioner's actions became an inconsequential cause of death having been

superseded by the malpractice.  But, it can never be said given the undisputed facts here that

petitioner's stabbing of the victim, nearly severing the entire jugular vein, and perforating the

liver and associated blood vessels near the spine, was an inconsequential cause of death.  This

was, in essence, the finding of the trial court when faced with the discovery and introduction of

evidence requests.  Indeed, petitioner presented no evidence whatsoever to contradict the treating

physician and the forensic pathologist who opined that the jugular near-severance *and* the liver

perforation were fatal injuries.  RT 507, 569.[3]

The undersigned is not an expert physician, and has no intent to become one for

the purposes of adjudicating this habeas petition.  However, some claims, *in the context of the

law,* can be viewed as so patently, substantively unmeritorious, even ones based on a medical

assertion, that a judge may so state.  The undersigned repeats the analysis of the Court of Appeal

on this very point:

\\\\\

---

[3] Moreover, petitioner's attack on the competence of the treating physician is focused only on the actions taken, or lack thereof, related to the jugular injury.

Defendant argues the court erred in (1) denying his motion to compel production of documents, (2) granting the People's motion to exclude evidence of medical malpractice, and (3) limiting his cross-examination of Ekdawy.  According to defendant, the trial court's denial of his motion to compel prevented him from laying a foundation that Ekdawy's malpractice was "grossly negligent and constituted an independent, intervening cause of death."

Both parties agree the Supreme Court in McGee set forth the standard for admitting evidence of medical malpractice in murder cases.  In McGee, the defendant shot the victim in the abdomen, grazing his liver and perforating his pancreas and spleen.  The victim was not operated on for almost 12 hours. (McGee, supra, 31 Cal.2d at p. 241, 187 P.2d 706.)  The defendant sought to admit expert testimony that had the victim been operated on sooner, he would not have died. ( Id. at p. 242, 187 P.2d 706.) The trial court denied the request, finding the issue of what constitutes improper medical treatment not a proper subject for expert testimony. ( Id. at pp. 242-243, 187 P.2d 706.)

The Supreme Court found the trial court ruled in error but the error was harmless. The court stated: "The refusal to permit Dr. Bloch to testify, however, did not prejudice defendant because the testimony which defendant apparently expected from him would not, as a matter of law, have been sufficient to show a supervening cause of death which would relieve defendant from criminal responsibility for the death of Rypdahl.  Viewed most favorably to defendant the evidence sought to be elicited from Dr. Bloch, with the evidence of the autopsy surgeon and the hospital records, together also with the testimony of defendant, would have disclosed the following situation: Defendant, without aiming and without intending to shoot Rypdahl, unlawfully, or 'without due caution and circumspection,' discharged a pistol which was pointed toward Rypdahl.  The immediate result of this unlawful or incautious act was the wounding of Rypdahl. The direct result of the wound was 'profuse hemorrhage' which would be 'sufficient to cause death' if it was not promptly controlled.  Having thus set in motion the events which culminated in Rypdahl's death, defendant departed.  The surgeon in whose care Rypdahl was promptly placed neglected for more than 10 hours, grossly contrary to good surgical practice, to control the hemorrhage.  We assume further that Rypdahl's life might have been saved by prompt and proper surgical treatment.  But defendant cannot complain because no force intervened to save him from the natural consequence of his criminal act.  The factual situation is in legal effect the same, whether the victim of a wound bleeds to death because surgical attention is not available or because, although available, it is delayed by reason of the surgeon's gross neglect or incompetence.  The delay in treatment is not in fact an intervening force; it cannot in law amount to a supervening cause." (McGee, supra, 31 Cal.2d at p. 243, 187 P.2d 706; italics added.)

Numerous cases have echoed the rationale of McGee. (People v. Scott (1997) 15 Cal.4th 1188, 1215, 65 Cal.Rptr.2d 240, 939 P.2d 354 (Scott ); People v. Roberts (1992) 2 Cal.4th 271, 312, 6 Cal.Rptr.2d 276, 826 P.2d 274; People v. Autry (1995) 37 Cal.App.4th 351, 360, 43 Cal.Rptr.2d 135.)  However, despite this authority, defendant argues: "If Dr. Ekdawy's conduct had been found to be 'extraordinarily negligent,' then [defendant] would have had a complete defense."

\\\\\

12

Defendant is wrong.  Even Ekdawy's "extraordinary negligence" would not provide defendant a defense unless there was evidence that Rupinder's death was not a direct, natural, and probable consequence of defendant's own conduct. (Scott, supra, 15 Cal.4th at p. 1215, 65 Cal.Rptr.2d 240, 939 P.2d 354 .) Only if Ekdawy's conduct was the "sole cause of death and hence an unforeseeable intervening cause" would any malpractice become relevant as a defense to defendant's murder charge. ( Ibid.)

No evidence presented to the jury supports this scenario. Testimony by both Ekdawy and the forensic pathologist established that two wounds inflicted by defendant would have been fatal.  Defendant nearly severed Rupinder's jugular vein.  Another knife blow penetrated Rupinder's liver, severely injuring nearby vascular structures.  Whatever alleged malpractice Ekdawy committed, it was not an intervening force.  Defendant, as the McGee court observed, "cannot complain because no force intervened to save him from the natural consequence of his criminal act." (McGee, supra, 31 Cal.2d at p. 243, 187 P.2d 706.) Given the facts of this case, the court did not err in denying defendant's motion to compel or in excluding evidence of malpractice. FN6

FN6.  We find People v. Basuta (2001) 94 Cal.App.4th 370, 114 Cal.Rptr.2d 285 (Basuta ), cited by defendant, distinguishable.  In Basuta, a daycare operator was convicted of assault on a child with force likely to produce great bodily injury resulting in death.  The trial court excluded evidence the child's mother had a history of abusive behavior.  The appellate court reversed, finding the court abused its discretion in excluding evidence of the mother's abusive behavior. ( Id. at pp. 384-388, 114 Cal.Rptr.2d 285.)  The court found that given the medical evidence of an earlier brain injury in the child, there were multiple possible causes of the child's death.  (Id. at p. 387, 114 Cal.Rptr.2d 285.)  The court noted the evidence allowed for the possibility the child died from a rebleed that resulted from a subdural hematoma.  In other words, the daycare operator could have inflicted a minor trauma that caused an earlier major trauma, inflicted by the child's mother, to rebleed, leading to death. ( Id. at pp. 387-388, 114 Cal.Rptr.2d 285.)  Here, in contrast, defendant argues Ekdawy's malpractice, which occurred after defendant inflicted the fatal wounds, was an intervening cause of death. Defendant does not argue Ekdawy previously treated Rupinder, leaving her susceptible to death even after a minor trauma.  We find Basuta inapplicable in the present case.

People v. Preciado, 2003 WL 121075 * 8-9.

Thus, petitioner cannot meet the standards for having an evidentiary hearing on the substance of his superseding cause theory.  Under California law he has no viable theory regardless of the merits of his gross incompetence allegations because the life threatening wounds were so serious.[4]

_____

[4] The undersigned can envision a situation in this case, however, far removed from the actual facts here, where a medical causation defense could be mounted.  For example, if the

1        The foregoing discussion directs a conclusion adverse to petitioner on his

2   discovery allegations.  Petitioner has no claim under established Supreme Court authority that the

3   due process clause entitled him to discovery which may be helpful to his theories – whether that

4   help assists in the defense case-in-chief, or on cross-examination.  No Supreme Court case has so

5   held, absent, of course, exculpatory evidence being at issue.  Neither does the Confrontation

6   Clause require pre-trial discovery.  Coleman v. Calderon, 150 F.3d 1105, 1112 (9th Cir. 1998)[5]

7   citing Pennsylvanai v. Ritchie, 480 U.S. 39, 52, 107 S.Ct. 989 (1987).  As has been exhaustively

8   set forth above, information concerning the competence or lack thereof of the emergency room

9   physician would not have exculpated petitioner.  Petitioner cannot assert a viable denial of

10  discovery claim.  It further follows that discovery in this federal habeas action concerning the

11  incompetence of the emergency room physician would not assist his primary claim of being

12  denied an ability to put on a defense.  Cf. Bracy v. Gramley, 520 U.S. 899, 908-909, 117 S.Ct.

13  1793, 1799 (1997) (discovery warranted where specific facts are presented which may

14  demonstrate that petitioner is entitled to relief.)

15        2.  The Cross-Examination Issue

16        The trial court ruled that absent evidence that petitioner did not inflict wounds that

17  would have been fatal if left untreated, petitioner would not be entitled to cross examine the

18  treating physician as to the competence of his care, including his actions during the "golden

19  hour" [of survivability].  RT 531-534.  Petitioner decries the inability to show bias on the part of

20  Dr. Ekdawy, who had been the subject of a hospital internal investigation and was a defendant, or

21  potential defendant in a wrongful death suit brought by the survivors of the victim's family.

22  Petitioner argues that such was an unconstitutional restriction on his right to cross-examine.

23

24  deceased here had been brought back from the precipice of death and was recovering nicely from
    her wounds in the hospital only to be accidently given an overdose of pain medication which then
25  caused her death, it may well be that the causation from the initial wounds would be superseded.

26        [5] Reversed on other grounds in Calderon v. Coleman, 525 U.S. 141 (1998)

Generally, restrictions on cross-examination are disfavored.  However, this does not mean that restrictions cannot be made.

> The Confrontation Clause of the Sixth Amendment, which "guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him,' " Van Arsdall, 475 U.S. at 678, 106 S.Ct. 1431, includes "the right of effective cross-examination," Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Effective cross-examination is critical to a fair trial because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis, 415 U.S. at 316, 94 S.Ct. 1105....
>
> The Supreme Court has recognized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Davis, 415 U.S. at 316-17, 94 S.Ct. 1105. Thus, "jurors [are] entitled to have the benefit of the defense theory before them so that they [can] make an informed judgment as to the weight to place on [the Government witness'] testimony." Id. at 317, 94 S.Ct. 1105.

United States v. Larson, 495 F.3d 1094, 1102 (9th Cir. 2007).

However:

> In reviewing a limitation on the scope of questioning within a given area, we recognize that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

Id. at 1101.

Moreover:

> The confrontation clause "guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " United States v. Owens, 484 U.S. 554, 559, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (quoting Kentucky v. Stincer, 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)). " 'A limitation on cross examination does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witness.' " United States v. Bridgeforth, 441 F.3d 864, 868 (9th Cir.2006) (quoting United States v. Holler, 411 F.3d 1061, 1066 (9th Cir.2005)).

Murdoch v. Castro, 489 F.3d 1063, 1069 (9th Cir. 2007).

\\\\\

15

The problem with petitioner's argument is that he fails to recognize the context of Ekdawy's testimony. As the Court of Appeal pointed out, Ekdawy was only called to detail the chronology of his treatment. No questions were asked on direct going to the competence of such treatment. The doctor was asked his views on what injuries he thought to be fatal. Thus, although bias would have been important had the competence of Ekdawy's treatment been in issue – it was not. The inability to show bias as to the chronology treatment, and the seriousness of the wounds testimony, facts which petitioner does not contest, was inconsequential. The trial judge's ruling restricting cross-examination did not violate established Supreme Court authority.

B. The Voluntariness of the Confession Issues

Petitioner, focusing on his youth at the time of the crime and police interrogation, urges that admission of the initial interrogation (prior to the found Miranda violation) was unlawful given that the statements were involuntary. He also urges that his non-interrogation statements to his mother after the police had left him and his mother alone in a room where the conversation could be recorded violated due process.

The Court of Appeal detailed the salient facts:

After defendant's arrest, officers took him to an interview room at the police station. At the beginning of the interview, Officer Ramos telephoned defendant's mother and asked her to come to the station. Ramos told defendant's mother of his arrest, adding, "it's serious."

Defendant complained of feeling "numb all over." He told Officer Landon he didn't know the cause of the numbness but stated his hands felt heavy. Landon asked defendant if he remembered "the Miranda rights that I read you that you knew so well." FN8 Defendant stated he had the right to remain silent and anything he said or did "can and will be-." Defendant told Landon he understood his rights. Landon asked defendant if he wanted to talk to him; defendant said he did.

FN8. Officer Landon advised defendant of his rights at the scene and asked him if he wanted to talk. Defendant stated he understood his rights. The interview at the station proceeded approximately 25 minutes later.

Landon asked what happened. Defendant stated he formed the idea to rob the store from watching a television show the night before. In the show, three little girls robbed a bank. He planned to "get the money and get out of there." However, defendant also stated he only planned to get a soda. Defendant

16

admitted "drinking a little bit" that morning and stated what happened next was "stupid."

Defendant took a kitchen knife with him and entered the store. He saw soft drinks were on sale, "$1.07 for two." Defendant was going to get two; he went up to the woman behind the counter and demanded all her money. The woman responded by slapping and pushing him and then she began to wrestle with him. Defendant did not mean to stab her. Defendant then demonstrated how the woman fell on the knife.

Defendant then revisited the incident, stating he walked into the store and saw soft drinks were on sale. He did not have $1.07, but the woman behind the counter would not sell him one drink at half the sale price for two. He started to leave but turned, pulled out the knife, and demanded money. She wrestled with him and pushed herself against him. He fell and she fell on top of him, landing on the knife.

Defendant repeated he found inspiration in the television show he had watched the night before. The show gave him the idea of taking a stocking mask, with holes cut out for his eyes. However, he did not intend to stab anyone. According to defendant, he was just going to go into the store, get the money and get out. The woman kept wrestling with him even after she fell on the knife, and might have fallen on the knife a few more times. She tried to turn the knife around and stab him. Defendant turned the knife away to prevent being cut.

When defendant saw the officer arrive, he began to run. The officer chased him in his car and hit him. When Landon asked defendant if he was currently in pain, defendant responded he was "aching all over." His arms were numb and his mouth hurt. Defendant asked if he could wash, and Landon gave him some water and told him he could wash when they finished "other things."

Defendant offered to provide the names of some drug dealers, but Landon asked to finish the interview first. Landon asked defendant where he got the $50. At first defendant could not remember but then stated the woman opened the cash register just as the officer arrived.

Following a brief interruption, defendant stated he did not want to see his mother. He again stated he did not remember how he got the $50 but then stated he grabbed the money when the woman opened the register.

Landon then asked defendant to go over the sequence of events one more time. At this point, defendant commented: "I don't have a lawyer present ... [¶] ... [¶][o]r a witness?" Defendant then requested an attorney and Landon stated he would provide one.

The interview continued. Defendant complained of bruising around his liver. Defendant asked if he was "gonna get for attempted murder?" Landon responded it was possible. Defendant asked, "How long will I do?" Landon responded it would depend "on a lot of things."

Landon asked whether defendant had been previously arrested or in trouble.

17

Defendant spoke of an incident with a pistol.  Landon asked about the $50 bill, and defendant stated: "I think it's hers."

Defendant requested a pen and paper and Landon provided both.  When he finished writing, defendant indicated he was having difficulty talking. Landon stated defendant knew who the drug dealer was and asked why defendant was afraid to see his mother.  Defendant again complained of numbness in his hands.  He also said he had a pain in his knees and mouth.

Following a break in the tape, defendant is seen speaking with his mother. Defendant told his mother he had been drinking and didn't know what he was doing.  He told his mother about the television show that gave him the idea and told her he took the knife from the house.

In the version of events defendant gave his mother, he stated he did not purposely stab the victim.  Instead, the victim began wrestling with him and hitting him. The victim pushed defendant down and fell on the knife.  Defendant told his mother he gave this version to the police.  His mother bemoaned the lack of witnesses but hoped a store camera had captured the incident.  Defendant admitted being very stupid and promised to change after he got out of juvenile hall.  Defendant again mentioned the effect of his drinking and said the officers had not done a sobriety test.

Defendant moved to suppress the entire videotape.  In ruling on the motion, the trial court divided the videotape into three parts: (1) the beginning of the interview, starting with defendant's recitation of Miranda rights and ending with his request for counsel; (2) the rest of the interview after the request ending at the break in the tape; and (3) the conversation between defendant and his mother. The court found part one admissible, noting defendant was read his Miranda rights at the station.  The court stated: "... Detective Landon asked defendant if he remembered his Miranda rights.  The defendant again began to recite the rights. Detective Landon asked defendant if he understood those rights.  The defendant said yes.  Detective Landon said, 'Okay. Do you want to talk to me now?' Defendant said 'Yes, I do.' [¶] Concerning all of the evidence presented, the Court having reviewed the tape and watching the demeanor of the defendant, ... the Court finds that defendant made a knowing, intelligent, voluntary, and express waiver of his Miranda rights, 4th and 5th Amendment rights, for Part 1 of the tape."  The court also found defendant explicitly stated he did not want his mother present.

As to part two, the court granted the motion to suppress, finding defendant invoked his right to counsel.  However, the court found the diagram drawn by defendant "is not the product of an illegal Miranda questioning of the defendant.... [¶] ... [He] made a voluntary and spontaneous statement regarding wanting to give that diagram."  The court denied the motion as to the diagram.

Finally, the court denied the motion to suppress as to part three.  The court found "no violation of defendant's reasonable expectation of privacy.  The conversation took place at the police station in the interrogation room.... No representations or inquiries were made as to privacy or confidentiality. [¶] There's no evidence of any subjective expectation of privacy.... The tape was simply rolling."  The court

also found: "With reference to the stopping and starting of the tape and any suggestion that there was a selective starting or stopping or suggestion that portions of the proceedings important to the defense were deleted, the Court finds from reviewing the tape no evidence to suggest that the tape was shut off or turned on improperly or arbitrarily." FN9

FN9. Part three of the videotape was never played for the jury.

People v. Preciado, 2003 WL 121075 at *10-12

The first issue to be decided is the amount of consideration due to the juvenile's age for this issue. The Supreme Court and Ninth Circuit have spoken with complex views on this issue.

Under the Supreme Court's due process jurisprudence, a criminal defendant's age has long been a relevant factor in determining whether a confession or a waiver of a constitutional right was voluntary. See, e.g., Withrow, 507 U.S. at 693, 113 S.Ct. 1745 (noting that a defendant's "maturity" is one of the factors used to determine if a defendant's confession was voluntary); Michael C., 442 U.S. at 725, 99 S.Ct. 2560 ("Where the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination."); Schneckloth, 412 U.S. at 226, 93 S.Ct. 2041 (stating that determination whether consent to search a car was voluntary is made under the totality of circumstances, including "the youth of the accused"); In re Gault, 387 U.S. at 45, 87 S.Ct. 1428 ("This court has emphasized that admissions and confessions of juveniles require special caution."); Gallegos, 370 U.S. at 54, 82 S.Ct. 1209 (ruling under the totality of circumstances that confession of 14-year old to charges of assault and robbery could not be "compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions"); Haley, 332 U.S. at 599-601, 68 S.Ct. 302 (ruling that murder confession made by 15-year old without consultation with counsel or parents "cannot be judged by the more exacting standards of maturity" and that defendant's due process rights had thus been violated).

Alvardo v. Hickman 316 F.3d 841, 848 (9th Cir. 2002).

However, Alvardo, a case dealing specifically with whether a juvenile's age should be considered in determining whether a reasonable person would believe he is "in custody" for purposes of custodial interrogation, was overruled in Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140 (2004). The Supreme Court held that analogous voluntariness jurisprudence was irrelevant to the issue before it.

\\\\\

Next, the Ninth Circuit in <u>Derrick v. Peterson</u>, 924 F.2d 813, 818 (9th Cir. 1990), *specifically rejected the use of age* to determine whether a confession was voluntary or whether the confession had been obtained in violation of the <u>Miranda</u> rule because of circumstances particular to a defendant (age, mental ability, etc.) *unless* the police had engaged in some type of coercive conduct.

> This totality of the circumstances test was clarified and refined by the Supreme Court in <u>Colorado v. Connelly</u>, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ( <u>Connelly</u> ). There, the Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id*. at 167, 107 S.Ct. at 522.  The Court emphasized that in the confession cases it had decided over the previous 50 years, the "crucial element" had been the presence of "police overreaching." *Id*. at 163 & n. 1, 107 S.Ct. at 520 & n. 1.  Thus, the Court has made it clear that a confession is only involuntary under the fourteenth amendment if the police use coercive activity to undermine the suspect's ability to exercise his free will.  As the Eighth Circuit stated, "<u>Connelly</u> makes it clear that ... personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion." <u>United States v. Rohrbach</u>, 813 F.2d 142, 144 (8th Cir.) (internal quotations omitted), cert. denied, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987).  Consequently, Derrick's age and mental capacity are relevant to our due process inquiry *only if we first conclude that the police's conduct was coercive.*

(Emphasis added).

The Ninth Circuit expressly recognized that in <u>Derrick</u>, as is the case here, that petitioner's primary argument was that "the age and mental capacity are the 'critical part' of the coercion claim.  In other words, this part of [petitioner's] argument assumes that the police behavior in question here was acceptable absent [petitioner's] own unique circumstances.  Such a claim is precisely the type that <u>Connelly</u> was intended to foreclose." <u>Id</u>. at 819.

The undersigned follows <u>Derrick</u> and first determines without regard to age whether the police conduct in this case could be construed to be coercive.  Petitioner has pointed to no facts in the opinion above, or elsewhere, which could be construed as coercive police conduct (no matter what the age).  Petitioner urges that the juvenile's statement to the police that he felt "numb," and that "his hand felt heavy" required immediate cessation of the interview. Obviously, the juvenile (or anyone else) whose future was on the line might indeed possess a great

deal of anxiety – the obvious symptoms exhibited by petitioner.  Counsel says the police officers

did nothing about this.  But, what were they to do?  The police interrogator phoned petitioner's

mother prior to asking any questions.  Petitioner was again informed of his <u>Miranda</u> rights, and

petitioner waived them.  CT 251-252.  An interview is not going to be halted simply because the

person to be interrogated is very anxious.  The facts here cannot be construed as police

misconduct.  Obviously, petitioner, although uncomfortable, was still in control of his thought

processes.  He did, in fact, later request that an attorney be present.  When he said his mouth hurt,

he was offered some water.  CT 261.  The officer stopped the interview for a moment when

petitioner's mother arrived, and *petitioner* said that he didn't want to see his mother then.  CT

263.  Nothing in petitioner's responses to the police questioning indicated that he was suffering

from a great amount of pain.

        Certainly, suppression of that part of the interview which occurred after a request

for counsel was validly suppressed; however, even here, the investigator's further questioning

came within the attempt to get some minor medical attention to the minor.  This violation does not

demonstrate police misconduct prior to that time.  Petitioner understands that all his argument has

going for it is his juvenile status, but <u>Derrick</u> precludes consideration of this factor in the

assessment of police misconduct.[6]

\\\\\

---

[6] Petitioner makes a vague assertion that the taped conversation of petitioner with his
mother is part of the alleged "involuntariness" situation; however, the court does not understand
that the police had any involvement in the conversation aside from passively taping it.  Nor can
the taping be a <u>Miranda</u> violation in that there is no evidence that the police were using the
mother in order to obtain further incriminating statements.  There was simply no "interrogation"
which would trigger a <u>Miranda/Edwards</u> violation.  Rather, the entire conversation between
mother and son was that of a spontaneously, very distraught mother asking her son "why," and
the son attempting to justify his conduct to some degree.  While mother and son did not
anticipate that the conversation was being taped in the interview room, no claim is made that the
taping *per se* was unlawful.  The situation here is no different than recorded phone calls in the
jail which, of course, unless initiated by the police for interrogation purposes, have no
<u>Miranda/Edwards</u> relevance at all.  Moreover, all the damage that needed to be done to
petitioner's case occurred in the first segment of the interview.

1    Petitioner's voluntariness claim should be denied as the age and emotional status

2    of petitioner never came into play in the voluntariness analysis.  The same holds true for

3    petitioner's secondary argument that petitioner did not have the competence to waive his <u>Miranda</u>

4    rights.  <u>Derrick</u> expressly applies to either argument.  <u>Derrick</u>, 924 F.2d at 820.  The state court's

5    analysis, although not referencing <u>Derrick</u> cannot be considered to be an unreasonable application

6    of Supreme Court (<u>Connelly</u>) authority.

7    *Instruction Issues*

8    A.  <u>Whether the Trial Court Erred in Refusing to Instruct on the Lesser Included Offense</u>

9    <u>of  Manslaughter</u>

10    The jury was instructed on both premeditated murder and felony murder – both

11    murder of the first degree.  However, the verdict form did not differentiate between the two; only

12    a verdict of guilty of first degree murder was rendered.  CT 721.  Nevertheless, one can easily see

13    from the record that evidence of felony murder predominated, and there was barely, if at all,

14    sufficient evidence of premeditated murder.

15    Despite this backdrop, i.e., a felony murder theory precludes manslaughter as a

16    possibility, petitioner alleges that his due process rights were violated because the court did not

17    instruct on the proffered imperfect self-defense manslaughter, and sua sponte instruct on other

18    manslaughter theories.

19    First, with respect to sua sponte instructions, no clearly established Supreme Court

20    authority requires the giving of sua sponte instructions.

21    "Failure of a state court to instruct on a lesser offense fails to present a federal
       constitutional question and will not be considered in a federal habeas corpus
22     proceeding." <u>James v. Reese</u>, 546 F.2d 325, 327 (9th Cir.1976). This general
       statement may not apply to every habeas corpus review, because the criminal
23     defendant is also entitled to adequate instructions on his or her theory of defense.
       <u>United States v. Kenny</u>, 645 F.2d 1323, 1337 (9th Cir.) ( reh'g and reh'g en banc
24     denied, appeal amended ), cert. denied, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d
       425, cert. denied, 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 104 (1981) ("jury must
25     be instructed as to the defense theory of the case")

26    <u>Bashor v. Risley</u>, 730 F.2d 1228, 1240 (9th Cir. 1984).

1   See also Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

2   Of course, one exception, as pointed out by Bashor is the defendant's actually asking for an

3   instruction on the theory of his case.  The other exception, not possible here, is the necessity to

4   give such instructions in a capital case.  Beck v. Alabama, 447 U.S. 625, 638, 100 S.Ct. 2382

5   (1980).

6         Counsel asked for only one manslaughter instruction based on imperfect self-

7   defense.  Therefore, petitioner cannot be heard here to suggest that his conviction should be

8   overturned based on non-expressed theories, i.e., that the court should have *sua sponte* instructed

9   on them.  Thus, although extremely weak anecdotal intoxication evidence was presented

10   (petitioner testified to some drinking and a relative who visited petitioner in jail thought he was

11   intoxicated) the fact of the matter is that petitioner's blood alcohol level soon after the robbery

12   was *zero*, RT 641)[7]. Counsel wisely did not request a voluntary intoxication instruction.  It can

13   hardly be said that if counsel did not ask for such an instruction, and is not assailed for not having

14   asked for it, the defense "theory of the case" was not instructed upon.  Indeed, in light of the zero

15   BAC, counsel would have looked foolish asking for an instruction that his client was so drunk that

16   he did not know what he was doing when he robbed the store and inflicted the wounds.  Nor was

17   any evidence presented on heat of passion manslaughter.  No federal due process error can be

18   ascribed to the trial court for not having instructed on those theories, as no Supreme Court case

19   requires *sua sponte* instructions.

20         With respect to imperfect self-defense, petitioner did testify that he unexpectedly

21   found himself in a struggle with the female store owner, and that the knife wounds were inflicted

22   in the course of that struggle.  The trial court refused to instruct saying (somewhat inconsistently

23   because of its instruction on second degree murder and self -defense) that it was "felony murder or

24   nothing at all."  RT 663.

25

26       [7] The robbery and murder occurred in late morning on July 7, 1999 and petitioner's blood
was drawn at 1:00 p.m.  RT 630.

1    However, the trial court was correct.  Once the *undisputed* facts of petitioner's

2  intent to rob were established, and these facts are truly undisputed,[8] there existed no cognizable

3  imperfect self defense theory.  That is because felony murder can occur even where the killing in

4  the course of the underlying felony is *accidental*, much less than occurring during a struggle over

5  the robbery weapon.  See CALJIC  8.21 (felony murder includes those killings which are

6  intentional, unintended, or accidental, as long as the killing is done with the pre-killing intent to

7  rob or burgle.)

8    Thus, there could not have been error in giving the imperfect self defense

9  instruction because it was legally impossible under the facts presented at trial.[9]

10    B.  Whether the Trial Court Erred in Refusing to Instruct on the Lesser Included Offense

11    of Grand Theft

12    As the California Court of Appeal discussed, grand theft is a lesser included

13  offense within robbery.  The distinction between the two is that with robbery, the property is taken

14  with the victim under the threat, or actuality, of force or fear from the robber.  Thus, if one

15  assaults a person, and only after the assault decides to take property, a robbery has not occurred,

16  but theft has.  People v. Preciado, 2003 WL 121075 at *16.

17    Petitioner confessed that after seeing a TV show he formed the intent to rob a store.

18  CT 252.  On the late morning of July 7, he then approached the store in question to get a soda

19  carrying a kitchen knife and stocking cap with eye holes cutout on his person aka "casing" the

20

---

21    [8] Petitioner plainly confessed to intending to rob the store based on a TV show that he had
     seen.  Petitioner had on his person a nylon stocking cap with eye holes cut out.  Petitioner
22  confessed to pulling his knife and showing it to the store owner prior to demanding the money.
     See the final section, infra.
23

24    [9] Again, the court understands that the prosecutor also floated the premeditated murder
     theory for which imperfect self-defense would be a legally possible "defense," but the court need
25  not ignore the obvious rational upon which the jury must have decided  this case – felony murder.
     If it were error not to give the instruction because of the presence of a pro forma premeditated
26  murder instruction, the failure to instruct on the defense theory was harmless beyond any possible
     doubt.

1   store.  Instead of buying the soda, "I went up to the lady and I said, 'Give me all your money' and

2   she slapped me, and she pushed me and she started wrestling with me.  I didn't mean to stab

3   her...."  CT 254.  "I pulled out the knife.  I said, "give me all your money.'" CT 256.  Petitioner

4   had also approached the store with a nylon stocking cap with eye holes cut out.  CT 259.  In light

5   of this evidence, and the fact that petitioner could point to *no* evidence indicating that his intent to

6   rob came after the assault on the store owner, the Court of Appeal came to the only logical

7   conclusion – there was no evidence to support the giving of a grand theft instruction.  In the

8   absence of evidence to support it, petitioner is not entitled to an instruction on the theory of his

9   case.  Solis v. Garcia, 219 F.3d at 929.

10          The Court of Appeal was clearly AEDPA correct.

11   *Conclusion*

12          For many murders committed for absolutely senseless reasons, it can be said that

13   two lives are thrown away – that of the deceased and the perpetrator.  Unfortunately, in this case

14   such is true.  A person died because another person happened to watch a "law and order" show

15   and received "inspiration" from it.  Evidently, petitioner did not watch the end of it – where the

16   defendant goes to prison.  The deceased store owner is not coming back, and petitioner, a 14 year

17   old boy at the time of the murder, is for all intents and purposes never going to see real life again.

18   However, under the law, he has no recourse.

19          Accordingly, IT IS HEREBY ORDERED that petitioner's request for discovery

20   and evidentiary hearing is denied.

21          IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

22   habeas corpus be denied.

23          These findings and recommendations are submitted to the United States District

24   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

25   days after being served with these findings and recommendations, any party may file written

26   objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 04/04/08

/s/ Gregory G. Hollows

_____
UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
prec1021.157